**DAVID J. HOLDSWORTH (4052)**
Attorney for Plaintiff
9125 South Monroe Plaza Way, Suite C
Sandy, UT 84070
Telephone (801) 352-7701
Facsimile (801) 567-9960

---

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | | |
|---|---|---|
| WILLIAM KENNETH KELLY, | : | **COMPLAINT** |
| | : | **(JURY TRIAL DEMANDED)** |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| UNUM GROUP and UNUM LIFE | : | |
| INSURANCE COMPANY OF | : | |
| AMERICA, , | : | Civil No.: 2:20-cv-00622-DB |
| | : | |
| Defendant. | : | Honorable Dee Benson |

COMES NOW, the Plaintiff William Kenneth Kelly (hereinafter "Mr. Kelly"), complains of Defendant UNUM Group and UNUM Life Insurance Company of America (hereinafter "UNUM"), and, as and for causes of action, alleges as follows:

## I. PARTIES

1.      Plaintiff William Kenneth Kelly is a citizen of the United States, who, at all times relevant hereto, was a resident of the State of Wyoming.

2.      At all times relevant hereto, Plaintiff was employed by Sinclair Oil Corporation, Sinclair Services Company, and/or Sinclair Wyoming Refining Company

(hereinafter "Sinclair").  Sinclair is a business which is headquartered in Salt Lake City, Utah.

3.      On information and belief, Defendant UNUM Group, UNUM Life Insurance Company of America (hereinafter "UNUM") is an insurance company which does business in the States of Utah and Wyoming.

4.      On information and belief, Plaintiff alleges UNUM provides group short-term and long-term disability insurance coverage and benefits to qualifying employees of Sinclair, pursuant to employee group health and welfare plans adopted by Sinclair and provided by Sinclair to its employees as a benefit of their employment. Plaintiff alleges Sinclair manages its group health and welfare plans out of its Salt Lake City headquarters.

5.      On information and belief, Plaintiff alleges that UNUM is the "plan administrator" for Sinclair's group short-term and long-term disability insurance plans and administers the above-described short-term and long-term disability insurance benefits/plans for employees of Sinclair who qualify for benefits under such plans.

## II.  JURISDICTION

6.      Mr. Kelly brings this action pursuant to the Employee Retirement Income Security Act of 1974, ("ERISA"), as amended, 29 U.S.C. § 1001, et seq. Jurisdiction is based on federal question, 28 U.S.C. §§ 1331, 1332 — namely, the

interpretation and application of various provisions of the ERISA and, specifically, §

502 (e) (1), 29 U.S.C. § 1132 (e) (1).

### III.  VENUE

7.      Venue in this Court is proper in that the causes of action alleged

herein arose in the federal District of Utah, ERISA § 502 (e) (2), 29 U.S.C. § 1132 (e)

(2), and/or the headquarters of Sinclair is located in the State of Utah, and/or the Plan

and employment records relevant to Plaintiff's claim may be found in the State of Utah,

and/or the Plan required civil actions regarding claims for benefits under the Plan to be

filed in the federal District of Utah.

### IV.  STATEMENT OF FACTS

#### A.  MR. KELLY'S EMPLOYMENT WITH SINCLAIR
#### AND COVERAGE

8.      Plaintiff incorporates by this reference all allegations listed in

paragraphs 1 through 7 above as if alleged in full herein.

9.      On approximately May 1, 2013, Mr. Kelly began employment with

Sinclair.

#### B.  MR. KELLY'S JOB AND THE DUTIES AND PHYSICAL AND
#### MENTAL REQUIREMENTS OF HIS JOB

10.     Plaintiff incorporates by this reference all allegations listed in

paragraphs 1 through 9 above as if alleged in full herein.

3

11.     At the time of the events alleged herein, Mr. Kelly worked as an engineer for Sinclair.  The title of his/position was Technical Adviser-Materials/Metallurgy for Sinclair.

12.     From his lengthy experience in this field and in his position for this particular employer, Mr. Kelly alleges his job required technical expertise in terms of both knowledge and skill, in order to be able to perform such tasks as observing and evaluating information, troubleshooting problems and developing and implementing solutions.  Physically, the job involved frequent sitting, standing, walking, frequent stooping, occasional kneeling and crouching, occasional crawling and climbing.  Mentally, the job also required high-level analytical abilities, communication, and "people" skills, reading, writing reports and working constructively with coworkers, supervisors and managers in a fast-paced, demanding work setting.

## C.  MR. KELLY'S MEDICAL IMPAIRMENTS

13.     Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through 12 above as if alleged in full herein.

14.     Mr. Kelly suffered a severe sickness in February 2015, and has never fully recovered.

15.     In approximately February 2015, Mr. Kelly began experiencing several new serious health conditions and impairments.  All of such serious health

4

conditions and impairments fall within the category of "sickness" (or "sicknesses"), as the Long-Term Disability Plan uses that term.

16.     Initial testing at University of Utah suggested that a bout of infection with Epstein Barr may have been the problem, but that testing in early summer was too far removed from the February sickness to be definitive.

17.     Thereafter, Mr. Kelly sought help from numerous physicians and specialists throughout 2015 and 2016.  Doctors suggested chronic fatigue syndrome, fibromyalgia, and post-infectious neurological syndrome, but none had any certain or effective treatments to restore Mr. Kelley's health to working strength.  The debilitating part of all these diagnoses/disorders is a combination of fatigue, general body pain, and deterioration in mental/emotional functioning.  Accurately assessing the degree to which each is causing loss of function is difficult for both patient and doctors.  In 2017, he took FMLA leave in order to see doctors at Mayo Clinic in Minnesota.  Thereafter, Mr. Kelly continued to need to use FMLA leave and missed several weeks of work.

18.     The 2015 infection and its aftermath limited Mr. Kelly's ability to work a full eight to ten-hour (or longer) shift and to obtain regular sleep at night.

19.     In addition to the physical problems mentioned above, in 2015 and 2016, Mr. Kelly began suffering from various psychological impairments, including anxiety with depressive symptoms.  Mr. Kelly alleges that, throughout the last half of

5

2017, his mental impairments began to be even more limiting than they had been in the past, his ability to concentrate and stay on task during a full work shift began to seriously erode and degrade, and, thus, his mental impairments began to be even more limiting than they had been in the past.

20.     Such serious health conditions and impairments substantially limited Mr. Kelly's ability to concentrate, remember, analyze data, think through problems, develop solutions to problems, communicate, multitask, interact with others and follow through to complete tasks in a timely and satisfactory manner.  .

21.     In late 2017, Mr. Kelly's physical and mental health deteriorated and his ability to perform work to a satisfactory standard in terms of quantity and quality began to decline quite precipitously.

22.     By late 2017, Mr. Kelly's serious health conditions and impairments had worsened so significantly that his serious health conditions and impairments caused him to miss parts of many days and many full days due to serious deficits and difficulties.  He became unable to perform the material and substantial duties of his regular occupation on a productive basis.  Due to the same sickness(es), he bean to experience a twenty-percent (20%) or more loss in his indexed monthly earnings.

### D.  MR. KELLY'S APPLICATION FOR SHORT-TERM DISABILITY INSURANCE BENEFITS AND APPROVAL

23.     Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through 22 above as if alleged in full herein.

24.     In late 2017, Mr. Kelly became unable to work on a full-time, or even part-time, productive basis.

25.     Accordingly, in December 2017, Mr. Kelly applied for short-term disability insurance benefits with UNUM.

26.     UNUM eventually approved Mr. Kelly's application for short-term disability insurance benefits and paid him short-term disability insurance benefits through approximately June 2018.

27.     Thereafter, Mr. Kelly's physical and mental impairments continued to worsen.  Due to such sicknesses, he never regained the ability to work and perform the material and substantial duties of his regular occupation on a full-time, or even part-time, productive basis.

### E.  MR. KELLY'S APPLICATION FOR LONG-TERM DISABILITY AND INITIAL DENIAL

28.     Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through 27 above as if alleged in full herein.

29.     Due to the sicknesses described above and the limitations they caused in his ability to function, in approximately July 2018, Mr. Kelly stopped

working for Sinclair and applied for long-term disability insurance benefits with UNUM.

30.     Generally speaking, since stopping work for Sinclair, Mr. Kelly's physical and mental impairments have not improved, but have continued to worsen.

31.     At the time he applied for long-term disability benefits, each of Mr. Kelly's treating health care providers independently certified that Mr. Kelly was unable to perform the material and substantial duties of his job and regular occupation on a regular, predictable, productive and sustained basis.

32.     Given Mr. Kelly's application for long-term disability insurance benefits, UNUM had a contractual obligation to fully and fairly develop the record.  To fulfill this obligation, UNUM had an obligation to determine what Mr. Kelly's serious health conditions and impairments were and whether any, some, or all of Mr. Kelly's serious health conditions and impairments created functional limitations which precluded him from performing the material and substantial duties of his job, his regular occupation or any full-time work on a productive basis.

33.     To discharge that contractual obligation, UNUM had a duty to do more than just review Mr. Kelly's medical records, it had a duty to fully and fairly develop "the record".  For example, if UNUM concluded that Mr. Kelly's medical records did not contain enough objective testing or enough objective medical evidence

8

of sickness(e)s or enough objective evidence of functional limitations, it had a duty to

obtain such testing and evidence.

34.     Mr. Kelly alleges UNUM failed to do so.

35.     By UNUM letter to Mr. Kelly dated May 14, 2019, UNUM denied

Mr. Kelly's application for long-term disability insurance benefits.

### F.  MR. KELLY'S INVOLVEMENT IN UNUM'S APPEAL PROCESS AND FINAL DENIAL

36.     Plaintiff incorporates by this reference all allegations listed in

paragraphs 1 through 35 above as if alleged in full herein.

37.     Mr. Kelly respectfully disagreed with UNUM's findings and

conclusions.  By letter from Mr. Kelly to UNUM dated June 7, 2019, Mr. Kelly

appealed UNUM's May 14, 2019 denial.  WITH said letter, Mr. Kelly submitted

updated and new medical information and additional factual and legal argument as to

why he qualified for long-term disability insurance benefits under the UNUM Plan.

### _UNUM's Flawed Methodology in Evaluating and in Deciding Mr. Kelly's Appeal_

38.     Thus, in his June 7, 2019 appeal, Mr. Kelly submitted a number of

pieces of medical evidence which provided an objective basis for (a) his diagnoses of

his multiple physical and psychological impairments; (b) what those impairments were

causing in terms of functional limitations; and (c) how such functional limitations were

preventing and precluding him from performing the material and substantial duties of his regular job/occupation or any occupation.

39.    Thereafter, by letter from UNUM to Mr. Kelly, UNUM notified Mr. Kelly that UNUM would <u>begin</u> the appeal process concerning [Mr. Kelly's] claim for long-term disability benefits.

40.    In his appeal, Mr. Kelly asserted, generally, that his job required him to sit, stand, lift, carry, to reach, push and pull, to see, to focus and concentrate, to remember and apply specialized knowledge and skill, to maintain regular attendance, to work in a fast-paced environment, to work on a regular and sustained basis, and to perform competently and generate outcomes at an acceptable level of productivity (quality and quantity).  Mr. Kelly asserted that his several physical and mental impairments were causing limitations in his ability to to do all of the above.  Mr. Kelly asserted that, as of approximately December 2017, as a result of his physical and mental health impairments and sicknesses, he could no longer perform the material and substantial duties of his job/regular occupation on a productive basis.

41.    Each of Mr. Kelly's treating physicians independently supported and endorsed Mr. Kelly's claim for long-term disability insurance benefits.

42.    Faced with this evidence, UNUM did not request Mr. Kelly to attend an in-person medical examination with a physician specializing in physical

10

medicine or a mental health professional of UNUM's choosing or to undergo any objective testing or to participate in a phone interview with such a physician or mental health professional, or to participate in a functional capacity evaluation, or to undergo a vocational assessment. Instead, what UNUM did (as most carriers do), was refer the "file" to a "peer reviewer" to determine if the medical documentation (which Mr. Kelly's providers had prepared for purposes of diagnosis and treatment, but had not prepared to support a claim for short-term disability insurance benefits or long-term disability insurance benefits or to identify functional limitations or to support work restrictions), supported his claim for disability insurance benefits.  In other words, UNUM did not affirmatively investigate Mr. Kelly's medical conditions or whether his medical conditions caused in terms of functional limitations or whether any such functional limitations precluded the ability to perform the material and substantial duties of his job/regular occupation on a full-time basis at an acceptable level of productivity, but simply took the medical records (which Mr. Kelly's treating physicians had prepared to document diagnosis and treatment and not to support a claim for disability insurance benefits and which did not focus on determining any functional limitations on Mr. Kelly's ability to work or identify any work restrictions), gave them to the "appeals reviewing physician", and asked the appeals reviewing physician to determine if such medical records contained objective evidence supporting the

11

existence of impairments generating functional limitations precluding Mr. Kelly's ability to perform the material and substantial duties of his regular occupation.

43.     For example, treating physician, Dr. Kaiser, given his long clinical experience with Mr. Kelly (in-person clinical interviews with a trained eye), and based on his longitudinal experience with Mr. Kelly, explained that he was of the opinion that Mr. Kelly could no longer engage in full-time, competitive, productive work.

44.     UNUM did not ask Dr. Kaiser to provide any additional clinical evidence or perform any additional objective testing (and so he did not do so).

45.     Then, again, quite predictably enough, UNUM (which did not ask or suggest to Dr. Kaiser that he provide any additional clinical evidence) discounted Dr. Kaiser's opinion.

46.     Because Mr. Kelly's treating providers had not prepared their medical records to support Mr. Kelly's claim for disability insurance benefits (but, rather, to document diagnosis and treatment), UNUM's appeals reviewing physician — no surprise here — opined that the treating physicians' records did not provide sufficient objective or clinical evidence to support functional limitations precluding the performing of the material and substantial duties of Mr. Kelly's regular occupation.

47.     So, the appeals reviewing physician's review became more about the content of the treating physicians' records than about whether Mr. Kelly was disabled within the meaning of the Long-Term Disability Plan.

48.     UNUM provides no evidence that the appeals reviewing physician examined Mr. Kelly, performed any tests on Mr. Kelly, or even interviewed Mr. Kelly, however, UNUM asserts that such appeals reviewing physician apparently reviewed some or all of Mr. Kelly's medical records (which his providers had prepared for purposes of diagnosis and treatment and <u>not</u> for purposes of supporting a claim for disability insurance benefits).

49.     In any event, by letter from UNUM to Mr. Kelly dated July 10, 2019, UNUM denied Mr. Kelly's appeal.

50.     Because UNUM decided that the medical records (which the treating physicians had prepared for purposes of diagnoses and treatment and not to support a claim for long-term disability insurance benefits), did not contain sufficient objective medical evidence of impairment in Mr. Kelly's body (or mind) to cause functional limitations (such as pain or loss of ability to concentrate and remember) to such a degree as to be incompatible with Mr. Kelly being able to perform the material and substantial duties of his regular job/occupation, and because UNUM did not make any efforts to obtain whatever objective medical evidence it might have deemed

13

necessary to obtain or ascertain whether Mr. Kelly's limitations were disabling, UNUM

denied Mr. Kelly's claim for long-term disability insurance benefits.  In other words,

UNUM undertook no efforts to develop the record in this area and simply decided that

the medical records (which his providers had prepared for purposes of diagnosis and

treatment and not for purposes of supporting a claim for disability insurance benefits)

did not contain sufficient objective, clinical medical support for Mr. Kelly's

impairments and functional limitations to allow it to approve his application for long-

term disability insurance benefits and to pay such benefits.

### G.  EXHAUSTION OF ADMINISTRATIVE REMEDIES

51.     Plaintiff incorporates by this reference all allegations listed in

paragraphs 1 through 50 above as if alleged in full herein.

52.     Mr. Kelly believes he has exhausted his administrative remedies

under the Long-Term Disability Plan.  In UNUM's last denial, UNUM did inform Mr.

Kelly that he had a right to bring a civil action under Section 502(a) of the Employee

Retirement Income Security Act of 1974.  By filing the instant Complaint, he is doing

just that.

53.     Mr. Kelly alleges that UNUM's process and decision to deny his

claim for long-term disability benefits is arbitrary, capricious, unreasonable and an

abuse of discretion in that, among other things, UNUM did not fully and fairly develop

14

the record, did not correctly evaluate his physical and mental conditions and functional limitations and did not correctly apply the Plan's definitions to the employment and medical facts.

54.     Mr. Kelly alleges UNUM's decision to deny his claim for long-term disability insurance benefits and not pay him long-term disability benefits constitutes a violation of his rights under ERISA.

## H.  GROUNDS FOR JUDICIAL REVIEW

### *Mr. Kelly's Physical Impairments*

55.     Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through 54 above as if alleged in full herein.

56.     To summarize, Mr. Kelly suffers from the following physical impairments:

(a)     Epstein Barr — Chronic Fatigue Syndrome;

(b)     central nervous system sensitization;

(c)     fibromyalgia.

### *Mr. Kelly's Mental Impairments*

57.     Mr. Kelly suffers from the following mental impairments:

(a)     anxiety with depressive symptoms;

        (b)     brain fog causing difficulty processing information, and difficulty communicating, such as occasional loss of words and stuttering when he is trying to speak.

58.    All of the above physical impairments have aggravated Mr. Kelly's mental impairments of anxiety with depressive symptoms and brain fog.

59.    Mr. Kelly's mental impairments have also aggravated Mr. Kelly's physical impairments, and made his fatigue, pain and functional limitations even worse.

### *How Mr. Kelly's Impairments Cause Functional Limitations and How Those Functional limitations Preclude His Ability to do His Job*

60.    Mr. Kelly's physical and mental impairments cause many functional limitations (Mr. Kelly describes these in his own words), which preclude Mr. Kelly from performing the duties of Mr. Kelly's job/regular occupation:

16

| **Job Duties** | **Impairment** | **Functional Implication** |
|---|---|---|
| sitting, standing, walking | chronic fatigue syndrome and fibromyalgia causing general body pain back pain | chronic pain, sitting limited to 30 minutes to an hour if the chair is an ergonomically correct chair, less if the chair is not ergonomically correct, standing and walking are limited to 15 minutes to 30 minutes, then becomes painful.  I become tired throughout the day and I am often in pain.  At home, I can spend hours in a recliner or in bed.  I can drive for periods of time in a car seat, but sitting upright in a professional office chair for long periods of time is not possible.  I occasionally need to lie down to let my body rest from the pain and fatigue. |

| - | - |
|---|---|
| standing, twisting, bending | fatigue, pain and balance issues | pain limits my ability to walk, stand and sit. I can move some, but I am badly hampered by my sickness. I use a cane as a balance aid because I have become accustomed to using the cane at home sometimes. I wanted to avoid the embarrassment of falling while at work.  Plant Safety decided that I shouldn't go into the operating units as long as I needed to have a cane as a balance aid. |
| regular attendance, punctuality and productivity | chronic fatigue syndrome and fibromyalgia causing fatigue and pain | this caused fatigue, lack of energy, if I am able to fall asleep, I could not wake up—even with an alarm clock, I would wake up tired and my tiredness would get worse during the day.  When the fatigue and pain are severe, I am not able to concentrate and I am distracted by the fatigue and pain.  I am slow to do anything wherever I am. |

| | - | - |
|---|---|---|
| maintaining regular attendance | fatigue and pain | my pain and fatigue was a problem from the beginning of my issues in 2015 through my application for disability benefits at the end of 2017.  When I was in too much pain or too fatigued, I just couldn't get to work on time.  Sometimes, I would be away from work for several days during the week.  In late 2017, I missed entire weeks of work. |
| staying on task 95% to 100% of the workday | fatigue, pain, discouragement | constant pain and exhaustion are distractions for anyone, and these distractions kept me from being on task at the level to which I was accustomed and my job required.  After two-plus years of suffering from the deterioration in my physical health.  I became more and more anxious and discouraged about the inability to function. |

| - | - | - |
|---|---|---|
| performing in a competent and fast manner | fatigue and pain | my health conditions made it difficult for me to get going in the morning, these distractions and discouragement slowed my responsiveness to all of the issues that arose in the course of my work. |
| performing in a competent and fast manner | anxiety | my performance began to decline in late 2017 |
| interact constructively with coworkers and supervisors | anxiety with depressive symptoms, brain fog | people could see that I was suffering.  They were concerned for my health.  Losing words in a conversation and occasionally stuttering slowed any conversations that I had.  I could still explain my rationale for my decisions well enough according to engineering principles, but the obvious loss of acuity undermined confidence in my ability to give recommendations on issues of process safety.  I was becoming sluggish, non-responsive, slow, |

| | - | - |
|---|---|---|
| ability to remember and complete complex projects, solve problems | fatigue, pain, distraction and brain fog | I was having difficulty in maintaining concentration erosion of memory.  I just functioned at such a slow pace because I was distracted by the pain and fatigue that I couldn't do enough.  I wasn't able to be available when needed.  My difficulties in speaking sometimes were a distraction and concern to others. |

61.    Thus, in late 2017, Mr. Kelly's physical and mental impairments caused limitations in sitting, concentrating and staying on task.  They impaired Mr. Kelly's ability to be regular in attendance and punctuality.  They eroded his ability to perform at a high level of speed and competence.  They reduced his ability to interact constructively with his professional colleagues.  They took him of out of workplace for all of the time he was on FMLA leave and for days and weeks in late 2017.  They have taken him out of the workforce since late 2017.

62.    Mr. Kelly respectfully alleges that the objective medical information previously submitted does support the existence of (a) multiple physical and mental impairments which were and which would reasonably be expected to continue to cause (b) multiple and significant functional limitations (including, but not

limited to, fatigue, pain, difficulty concentrating, analyzing and solving problems in a productive manner, which functional limitations are (c) preventing Mr. Kelly from performing the material and substantial duties of his regular occupation at an acceptable level of performance in competitive employment, such as maintaining regular attendance, staying on task for several hours a day, performing at a satisfactory level of quantity and quality and productivity for eight to 12 hours a day, five days in a row, week after week, month after month.

63.     The appeals reviewing physician, not surprisingly, opined that the records of Mr. Kelly's treating providers (which focused on diagnosis and treatment, and not on a patient's activities of daily living or ability to work or on eligibility for long-term disability insurance benefits) are not consistent with <u>complete inability to work in any job</u>.  But that's not the test in the policy at issue.

64.     Mr. Kelly alleges the appeals reviewing physician mis-evaluated Mr. Kelly's physical and mental impairments.

65.     Mr. Kelly alleges the appeals reviewing physician mis-evaluated his functional capacity.

66.     The test is whether Mr. Kelly's sickness(es) prevented Mr. Kelly from performing one or more of the material and substantial duties of his

22

job/occupation (including the ability to work the number of hours [required] in [his]

regularly scheduled workweek).

        67.    Mr. Kelly challenges both UNUM's methodology and decision as

being unreasonable.

        68.    Mr. Kelly concedes that the policy does require some proof of a

sickness, but the policy does not require such to be established or manifested only by

objective medical evidence.  Accordingly, Mr. Kelly alleges that the claimant may

establish the existence of sicknesses and the functional and vocational/employment

implications of sickness by a host of different types of information and that no one type

of information (such as objective medical evidence) is necessary or dispositive.

        69.    Mr. Kelly alleges that, essentially, the nature of the dispute or the

contours of the dispute as to whether Mr. Kelly's medical and employment/vocational

facts satisfy the definition of disability in the Long-Term Disability Plan seems to be as

follows: (1) UNUM is likely interpreting the definition of disability as requiring a

sickness to be manifested solely by objective medical evidence; and (2) UNUM is also

requiring not only the existence of a sickness to be established by objective medical

evidence, but is also requiring the restrictions and limitations which such sickness

causes to be tested, documented, and measured by objective medical evidence,

regardless of the practicalities or costs involved on the part of the claimant; and (3)

such objective medical evidence must establish that Mr. Kelly cannot only not work in his regular occupation, but in any job.

70.     Hence, Mr. Kelly's position is that UNUM's process of having the medical record reviewer just review the medical records violates the Long-Term Disability Plan.

71.     UNUM (and its file reviewer) did not tell the treating physicians to generate objective medical evidence, such as by requiring the claimant to undergo any functional capacity evaluation or well recognized psychological tests.

72.     Instead, UNUM "laid in wait" to see if the treating doctor(s)' records just happened to contain that kind of "objective" information, and, if they did not, rushed to judgment and denied the claim based solely on a reviewer's review of the medical records.

73.     By so doing, UNUM can develop what appears to be a bona fide rationale to justify its denial.  And because denying the claim for long-term disability benefits cuts off a source of income which the claimant was counting on, the claimant, who now realizes that UNUM is requiring certain types of objective medical information to prove up his claim, now has no money with which to pay for the type of objective medical evidence UNUM is demanding.

74. Thus, Mr. Kelly also challenges UNUM's denial as being unreasonable, arbitrary, capricious and an abuse of discretion and, therefore, a violation of the Long-Term Disability Plan.

75. Long-term disability insurance carriers may properly focus on the link between a claimant's sickness(es) and the implications of such on the claimant's ability to perform the material and substantial duties of the claimant's regular occupation. That's the core issue in any disability claim.

76. Ofttimes, however, to make that determination, a carrier will just have a medical reviewer review the claimant's medical records (however well or however poorly these records may have been prepared) and not examine or interview the claimant or a claimant's treating providers or perform any objective testing or functional capacity evaluation or vocational assessment. A busy treating physician's focus on diagnosis and treatment and failure to perform expensive and exhaustive "objective" testing or, evaluate and document a patient's functional deficits or to focus a substantial amount of time on paper trailing a patient's functional capacity and how it might affect a claimant's ability to work in his particular job or occupation, as opposed to focusing on diagnosis and treatment, provides an "easy out" for a carrier to deny a claim because of supposed deficiencies in the treating physician's medical records which are usually going to be deficient in that respect.

25

77.     Sometimes a file reviewer, while not examining the claimant, will reach out to the treating physician(s).  These doctor-to-doctor communications (if they occur at all) may not be terribly productive.  A treating physician may not appreciate having his medical record documentation question or, being second guessed, or, if the treating physician comes on too strongly in favor of eligibility, being accused of having lost his or her objectivity.  He or she is placed in a no-win situation.

78.     In any event, in the instant case, the medical record reviewer based his opinion on medical records which were never intended, or prepared for the purpose of generating objective medical evidence to support Mr. Kelly's claim for long-term disability benefits.  Accordingly, Mr. Kelly alleges the medical record reviewer's opinion is incomplete and UNUM's reliance thereon is flawed.  And, consequently, Mr. Kelly claims UNUM's decision is unreasonable, arbitrary and capricious and abuse of discretion.

79.     Thus, Mr. Kelly appeals and files this Complaint seeking judicial review of UNUM's denial.

## V.  DAMAGES

80.     Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through 80 above as if alleged in full herein.

26

81.     UNUM's denial has caused Mr. Kelly the loss of long-term

disability insurance benefits to which he is eligible.

82.     Such denial has also substantially aggravated Mr. Kelly's physical

and mental impairments.

83.     Such denial has caused other consequential damages.

84.     Such denial has also necessitated that Mr. Kelly hire an attorney

and incur attorneys fees and court costs.

## VI.  CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### FOR A DECLARATION THAT UNUM'S
### DECISIONS AND DENIAL WERE ARBITRARY AND CAPRICIOUS

85.     Plaintiff incorporates by this reference all allegations listed in

paragraphs 1 through 84 above as if alleged in full herein.

86.     Mr. Kelly alleges that, under the unique circumstances of the

instant case, UNUM's decisions to deny Mr. Kelly eligibility for long-term disability

insurance benefits were arbitrary, capricious, unreasonable and an abuse of discretion.

87.     During its processing of Mr. Kelly's request for review, UNUM

did not examine Mr. Kelly or inquire of Mr. Kelly as to the severity of his conditions, or

what restrictions and limitations his physical and mental impairments caused as to his

ability to perform the material and substantial duties of his regular occupation.   Then,

based on its review, which did <u>not</u> include such an actual examination or inquiry as to such conditions and what those conditions would cause in terms of functional limitations, but just a review of medical records, UNUM determined that Mr. Kelly did not qualify for long-term disability insurance benefits.

88.     Mr. Kelly alleges the issue is not <u>whether his medical records</u> contain sufficient objective medical evidence of physical and/or mental impairment or refer to restrictions and limitations incompatible with him being able to work in his job or occupation.  Mr. Kelly alleges the issue is whether the medical records and all other evidence provides evidence of the existence of medical conditions, impairments, sicknesses, or mental illnesses, from which Mr. Kelly suffers, which could and do create or generate restrictions and limitations which would and do render him unable to perform one or more of the material and substantial duties of his regular occupation on a full-time, productive and sustained basis.  And, in particular, whether Mr. Kelly suffered from such restrictions and limitations which rendered him unable to work as of late 2017 and thereafter on an ongoing basis.

89.     To determine the issue of whether a claimant's circumstances meet the Long-Term Disability Plan's definition of being disabled, a long-term disability carrier which <u>decides to not examine or even interview a claimant</u> can certainly obtain and review a claimant's medical records (and it can inquire of the treating physician(s)

28

whether the claimant's medical conditions would be expected to cause any restrictions or limitations, and, if so, whether such restrictions and limitations would render the claimant incapable of performing all of the material and substantial duties of his regular occupation on a full-time, productive and sustained basis).

90.     And, <u>if</u> the medical provider has prepared his or her medical records with a view of preparing such records to support (or not support) a claim for long-term disability insurance benefits, and <u>if</u> a physician has a solid understanding of the claimant's job, and the physical and cognitive and social requirements of the claimant's job, and then provides an evaluation of the claimant's medical conditions and whether such medical conditions cause restrictions and limitations, and whether such restrictions and limitations impact claimant's ability, or lack of ability, given those restrictions and limitations, to perform the material and substantial duties of the claimant's regular occupation on a full time, productive and sustained manner, and <u>all of the above finds its way into the medical records</u>, the carrier can have confidence that only reviewing a treating physician's medical records will capture the reality of the claimant's ability to work in his regular occupation.

91.     But where, as in the instant case, a disability insurance carrier relies on medical records which do not directly address or measure, in objective medical terms, all of the claimant's impairments, restrictions and/or limitations, and how they

might or do impact the claimant's ability to perform the material and substantial duties of his regular occupation, and does not examine the claimant, and does not interview the claimant,  and does not obtain relevant information from the claimant's treating physician(s) and employer or require the claimant to undergo objective testing or a functional capacity evaluation or a vocational assessment, all of which, claimant, on information and belief, alleges UNUM did <u>not</u> do with respect to the claim at issue herein, then the claimant can fairly allege that a denial made on the basis of such incorrect and incomplete information is arbitrary, capricious, unreasonable, and an abuse of discretion.  Mr. Kelly so alleges.

92.     Mr. Kelly seeks the Court to grant declaratory relief to that effect.

## SECOND CAUSE OF ACTION
## UNDER ERISA FOR RECOVERY OF BENEFITS

93.     Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through 92 above as if alleged in full herein.

94.     The Sinclair Long-Term Disability Plan are subject to the ERISA.

95.     Mr. Kelly is a participant or beneficiary in such Long-Term Disability Plan.

96.     Mr. Kelly's treating physicians endorse and support Mr. Kelly's claims for long-term disability insurance benefits.

97.     Mr. Kelly alleges his submissions satisfy each of the criteria for eligibility for long-term disability insurance benefits under the Long-Term Disability Plan.

98.     Mr. Kelly alleges the UNUM failed to comply with its obligations under the Long-Term Disability Plan.

99.     Mr. Kelly alleges he has provided medical evidence, both subjective and objective, that he suffers from one or more serious health conditions and impairments and sicknesses.  He has provided medical and other evidence which establishes that such medical conditions cause or result in functional limitations which, in turn, cause him to be unable to perform the material and substantial duties of his own job and regular occupation on a full time, productive, sustained basis.

100.     Mr. Kelly alleges the totality of Mr. Kelly's medical documentation (including doctor's records, FMLA paperwork, and UNUM forms) taken collectively, establishes that Mr. Kelly's treating physicians have determined that Mr. Kelly suffers from medical conditions sufficient to cause substantial limitations in his ability to sit, stand, lift, reach, concentrate, focus, and interact with others, such that his medical conditions preclude him from being able to perform the material and substantial duties of his job and regular occupation on a full time, productive and sustained basis.

31

101.    Mr. Kelly alleges that UNUM has an obligation to review and, if necessary, develop medical and other evidence to address the questions (1) whether the claimant has a medical condition or conditions, (2) whether the medical condition(s) creates or results in limitations in functioning; and that (3) whether, due to such medical condition or conditions and such limitations in functioning, the claimant is unable to perform the material and substantial duties of his own job/regular occupation on a full time, productive and sustained basis.

102.    UNUM has based its decision on a file reviewer's opinion who did not perform any examination of or interview of Mr. Kelly, and who did not perform or order any relevant objective tests, did not arrange for a functional capacity evaluation, did not arrange for a vocational assessment, but who only reviewed medical records from treating providers (who did not intend, design or prepare their records to address the issues of Mr. Kelly's ability to work or inability to work or eligibility for long-term disability benefits).

103.    UNUM has not supported its denial by referring to any medical doctor who has actually examined or interviewed or tested Mr. Kelly, who has come to a different conclusion.

32

104.    UNUM has not supported its denial by referring to any functional capacity evaluator <u>who has actually examined or evaluated Mr. Kelly's functional capacity</u>, who has come to a different conclusion.

105.    UNUM has not supported its denial by referring to any vocational rehabilitation or placement counselor <u>who has actually examined and reviewed Mr. Kelly's situation (age, education, training, work experience, current job, medical history, and functional capacity)</u>, who has come to a different conclusion.

106.    Accordingly, Mr. Kelly contends that UNUM's initial, final and continuing denial of his claim for long-term disability insurance benefits is contrary to the facts, contrary to his treating physicians' opinions, and contrary to the weight of the totality of the evidence, and is, therefore, arbitrary, capricious, unreasonable and an abuse of discretion.

107.    Mr. Kelly alleges that, from late 2017 to the present and ongoing, due to the serious health conditions/impairments described above, he has been disabled from performing all of the material and substantial duties of his job and of his regular occupation (or any other occupation) and, therefore, he qualifies for such long-term disability insurance benefits.

108.    Mr. Kelly alleges that, from late 2017 to the present and ongoing, Mr. Kelly has been disabled, as defined in the Plans, and is eligible for long-term

33

disability instheurance benefits under the Plans for the full term of such long-term disability insurance benefits.

109.    Mr. Kelly alleges that he has satisfied all the conditions required of him by the above-named Plans to qualify for long-term disability insurance benefits.

110.    Mr. Kelly alleges UNUM has failed, and is still failing, to pay the long-term disability insurance benefits due to Mr. Kelly under the Plans.

111.    For the reasons set forth above, Mr. Kelly alleges that UNUM's reasons for doing so are arbitrary, capricious, unreasonable, and an abuse of discretion.

112.    By denying Mr. Kelly eligibility for long-term disability insurance benefits, UNUM has deprived him of his rights to benefits under the Plan, in violation of ERISA § 502 (a) (1) (B) and 29 U.S.C. § 1132 (a) (1) (B).

113.    Such actions and inactions have caused Mr. Kelly harm, injury, loss and damage.

114.    Such actions and inactions have also necessitated Mr. Kelly to hire counsel and to incur attorney's fees and costs.

115.    Mr. Kelly has exhausted all his administrative remedies under the Plans or alleges that further pursuit of administrative remedies would be futile.

116.    ERISA provides means for Mr. Kelly to be able to enforce his claim for long-term disability insurance benefits under the Plans.

117.   Defendant UNUM is liable to pay Mr. Kelly the amount of long-term disability insurance benefits determined to be owed him after approximately late 2017 for as long as he meets the definition of disability, plus pre- and post-judgment interest to the date on which he is no longer disabled, and the reasonable attorney's fees and costs he has incurred in bringing this action, all pursuant to 29 U.S.C. § 1132 (g).

WHEREFORE, Plaintiff prays for judgment against Defendant UNUM and seeks the following relief:

1.   A declaration that Mr. Kelly was disabled under the Plan as of approximately late 2017 and continued to be disabled from that date forward to the present and continues to be disabled;

2.   For long-term disability insurance benefits under the Plan from late 2017 to the present and for as long as he continues to satisfy the definitions of disability and otherwise remains eligible for long-term disability benefits;

3.   For pre- and post-judgment interest;

4.   For attorney's fees and court costs; and

5.   For such further relief as may be just and/or equitable.

DATED this 3rd day of September, 2020.


_/s/ David J.  Holdsworth_____
David J.  Holdsworth
*Attorney for Plaintiff*

VERIFICATION

William Kenneth Kelly, being first duly sworn, upon his oath, deposes and says that he is the Plaintiff in the above-entitled action, that he has read the foregoing COMPLAINT and understands the contents thereof, and the allegations made therein are true of his own knowledge, except as to those matters alleged on information and belief which he believes to be true.


_/s/ William Kenneth Kelly_____
William Kenneth Kelly


SUBSCRIBED AND SWORN to before me, a Notary Public, this _____ day of _____, 20___.


_____
NOTARY PUBLIC

MY COMMISSION EXPIRES:        RESIDING AT: _____

_____