IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| WILLIAM KENNETH KELLY,<br><br>        Plaintiff,<br>v.<br><br>UNUM GROUP and UNUM LIFE INSURANCE COMPANY OF AMERICA,<br><br>        Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:20-cv-00622-JNP-DBP<br><br>District Judge Jill N. Parrish<br><br>Magistrate Judge Dustin B. Pead |

The plaintiff in this case, William Kenneth Kelly ("Kelly"), seeks to recover long-term disability ("LTD") benefits denied him by Defendants UNUM Group and UNUM Life Insurance Company of America (collectively, "UNUM" or "Defendants"). Defendants filed a motion for summary judgment, arguing that their decision to deny LTD benefits was reasonable and supported by the administrative record. For the reasons discussed below, the court GRANTS summary judgment in favor of Defendants.

**FACTUAL BACKGROUND**

Kelly is a former employee of Sinclair Oil Corporation, Sinclair Services Company, and/or Sinclair Wyoming Refining Company ("Sinclair"). ECF No. 2 ¶ 2. Sinclair provides an ERISA employee group health and welfare plan (the "Plan") to eligible employees. The Plan, funded through an insurance policy issued by UNUM, includes monthly long-term disability benefits to employees who become disabled while covered by the Plan. ECF No. 21-5, at 4. UNUM is the plan administrator. Under the Plan, UNUM has discretionary authority to determine eligibility for benefits and to interpret the terms and conditions of the Plan. *Id.* at 11.

The Plan provides benefits to participants while they are "disabled." *Id.* at 4. The Plan defines "disabled" as "when Unum determines that: you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury." *Id.* at 14. Under the Plan, "limited means what you cannot or are unable to do." *Id.* at 29.

The Plan is an "own occ/any occ" plan, meaning that UNUM evaluates the participants disability status in relation to the participant's own occupation for the first twenty-four months, then any occupation thereafter. ECF No. 19 ¶ 6. Accordingly, payments continue until the earlier of the following: "during the first 24 months of payments, when you are able to work in your regular occupation on a part-time basis and you do not" or "after 24 months of payments, when you are able to work in any gainful occupation on a part-time basis and you do not." ECF No. 21-5, at 20.

Kelly worked as a Technical Advisor – Materials/Metallurgy for Sinclair. UNUM's Vocational Rehabilitation Consultant determined that Kelly's regular occupation[1] required the following demands:

- Physical Demands:
    - Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds frequently
    - Frequently sit, reach, and handle
    - Occasionally stand, walk, finger and keyboard
- Mental/Cognitive Demands
    - Directing, controlling, or planning activities of others
    - Performing a variety of duties
    - Attaining precise set limits, tolerances, and standards
    - Dealing with people
    - Making judgments and decisions

---

[1] Per the terms of the Plan, "regular occupation" refers to "the occupation you are routinely performing when your disability begins." ECF No. 21-5, at 30. To determine the elements of a participant's regular occupation, "Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location." *Id.*

ECF No. 21-4, at 486.

Kelly became severely ill in February 2015. ECF No. 2 ¶ 14. In the aftermath of the 2015 infection, Kelly began to experience fatigue, general body pain, and deterioration in his mental/emotional functioning. *Id.* ¶ 17. Around the same time (2015 to 2016), Kelly began suffering from anxiety with depressive symptoms. *Id.* ¶ 19. Kelly went to a variety of doctors for testing. In addition to consulting with his primary care physician, Dr. Kaiser, Kelly took part in testing at the University of Utah. The testing came back normal, except for the presence of the Epstein Barr virus, which was present at levels frequently seen in the general population. *Id.* ¶ 16; ECF No. 21-4, at 488 (noting that Kelly's "EBV results were consistent with prior illness at some point in your life, which is consistent with about eight[y] to ninety percent of the general adult population"). In 2017, Kelly took FMLA leave to see doctors at the Mayo Clinic in Minnesota. ECF No. 2 ¶ 17. He spent nine days undergoing testing at the Mayo Clinic, which failed to reach a conclusive diagnosis.

Kelly initially submitted a claim for short-term disability benefits in December 2017. *Id.* ¶ 25. UNUM paid short-term disability benefits from December 15, 2017 through June 14, 2018. *Id.* ¶ 26; ECF No. 21-3, at 426. Kelly then stopped working for Sinclair and applied for long-term disability benefits. Kelly cited "unknown generalized weakness" and "ataxia," a nervous system disorder that describes a lack of muscle control or coordination of voluntary movements. ECF No. 21-4, at 49. UNUM denied the benefits on May 14, 2019. ECF No. 2 ¶ 35. Kelly appealed the decision on June 7, 2019. *Id.* ¶ 37. On July 10, 2019, UNUM denied Kelly's appeal. *Id.* ¶ 49. Over the course of his claim and appeal, two nurses and three physicians reviewed Kelly's file. ECF No. 19, at 2. UNUM also reached out to or spoke with all of Kelly's treating physicians. *Id.*

After exhausting his administrative remedies, Kelly brought this action. He alleges that UNUM wrongfully denied his claim for long-term disability benefits in violation of ERISA. *See* 29 U.S.C. § 1132(a)(1)(B). UNUM subsequently moved for summary judgment.

## LEGAL STANDARD

A plan administrator's denial of ERISA benefits is reviewed de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Where a plan vests such discretion in the plan administrator, a reviewing court will instead apply "a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious." *Weber v. GE Grp. Life Assurance Co.*, 541 F.3d 1002, 1010 (10th Cir. 2008) (citations omitted). Because both parties agree[2] that the Plan vests such discretion in the plan administrator, the court applies an arbitrary and capricious standard.

Applying arbitrary and capricious review means that this court will uphold the administrator's determination "so long as it is predicated on a reasoned basis." *Adamson v. Unum Life Ins. Co. of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006). "The Administrator's decision need not be the only logical one nor even the best one" as long as it is "sufficiently supported by facts within his knowledge." *Finley v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan*, 379 F.3d 1168, 1176 (10th Cir. 2004) (quoting *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999)). In fact, Defendants need only show that their "decision resides somewhere on a continuum of reasonableness—even if on the low end." *Adamson*, 455 F.3d at 1212 (citation omitted). Conversely, a plan administrator abuses its discretion when its decision is not supported by substantial evidence. *Id.*

---

[2] Kelly concedes that the arbitrary and capricious standard of review applies. *See* ECF No. 25, at 55. UNUM agrees. ECF No. 19, at 30.

4

## ANALYSIS[3]

Kelly argues that UNUM's denial of benefits constituted an abuse of discretion because (1) UNUM failed to follow a reasonable methodology when it relied solely upon Kelly's medical records, (2) the record does not contain substantial evidence to support UNUM's determination that Kelly does not have physical or cognitive impairments that limit his ability to work, (3) UNUM improperly required Kelly to demonstrate an acute worsening of his symptoms, and (4) UNUM applied the wrong test in making its disability determination. The court addresses, and rejects, each argument in turn.

### I. METHODOLOGY

Without citation to any caselaw or other legal basis, Kelly highlights a series of alleged issues with the methodology UNUM used to review his case. Kelly contends that UNUM acted unreasonably by relying solely on treating physicians' medical records to determine if he met the Plan's definition of disabled. Kelly further argues that UNUM ignored the information he included in his application for benefits. Kelly also contends that UNUM inappropriately focused only on medical records prepared in the normal course of treatment, not medical records prepared for the purpose of determining whether Kelly was disabled. Moreover, Kelly complains

---

[3] The court notes that, in a typical ERISA case, both parties move for summary judgment. When that occurs, the parties have effectively "stipulated that no trial is necessary" and thus "summary judgment is merely a vehicle for deciding the case." *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (citation omitted). In such a case, "the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor." *Id.* (citation omitted). But, here, Kelly failed to move for summary judgment. Nevertheless, even if the court applies the usual Rule 56(a) summary judgment standard in which the court makes all reasonable inferences in favor of the non-moving party to determine whether "there is no genuine dispute as to any material fact," UNUM still prevails. For that reason, the court need not address whether to refrain from granting inferences in favor of the non-moving party in an ERISA case where one side fails to move for summary judgment.

that UNUM never examined Kelly, interviewed Kelly, nor required him to undergo any testing or functional capacity evaluations.

As an initial matter, Kelly misrepresents the steps that UNUM undertook in conducting its review of Kelly's claim. UNUM did not solely rely on Kelly's medical records. Indeed, contrary to representations contained in Kelly's briefing, UNUM did interview Kelly about his conditions. ECF No. 21-2, at 284-91. UNUM reached out to Kelly's primary care providers to speak with them about Kelly's health (although it was not able to reach all providers). ECF No. 21-4, at 486-91. UNUM also spoke with Kelly's chiropractor, Kendra Sims, and his therapist, Jennifer Cruickshank. *Id.* at 31, 490. UNUM reviewed the evidence that Kelly submitted. *Id.* at 117–18, 490.

And even had UNUM relied solely on Kelly's medical records, the comprehensive nature of his records would have been sufficient to make an informed decision about his disability status. *See Meraou v. Williams Co. Long Term Disability Plan*, 221 F. App'x 696, 704 (10th Cir. 2007) (unpublished) ("Generally, it is not unreasonable for a plan administrator to deny benefits based upon a lack of objective evidence." (citation omitted)). ERISA requires that UNUM provide Kelly with "a full and fair review." 29 U.S.C. § 1133(b). A "full and fair review" must "take[] into account all comments, documents, records, and other information submitted by the claimant relating to the claim." 29 C.F.R. § 2560.503-1(h)(2)(iv). But nothing in the ERISA regulations requires UNUM to take steps beyond a comprehensive examination of the insured's medical records and other documents or records submitted by the insured. UNUM went beyond the bare minimum by interviewing Kelly, attempting to interview his medical providers (and successfully interviewing several providers), sending proposed findings to Kelly for his

6

response, and inviting Kelly to submit supporting records from his treating therapist and other providers.

Kelly further complains that UNUM based its determination solely on medical records prepared in the normal course of treatment, not medical records prepared specifically for the purpose of an LTD application. But there is no requirement that an insurer specifically review or give additional weight to records prepared by a physician with an eye towards a disability application, nor that an insurer discount records prepared in the normal course of care. Indeed, records prepared in the normal course of care—not records prepared with the purpose of supporting a patient's LTD application—likely represent the most credible source of information about an insured's health.[4] *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003) ("[A] treating physician, in a close case, may favor a finding of 'disabled.'").

Finally, ERISA does not require an insurer to conduct testing or functional capacity evaluations on an insured. *Flanagan v. Metro. Life Ins.*, 251 F. App'x. 484, 487–89 (10th Cir.

---

[4] Kelly also highlights the stark difference between his doctor's conclusions and the conclusions of UNUM's reviewers. Kelly attempts to frame this case as follows:

> What makes this case interesting and challenging is that most, if not all, of the physicians who have actually interacted with and treated Mr. Kelly . . . have submitted opinions that, due to such disorder, Mr. Kelly is not able to work, and, therefore, that Mr. Kelly is disabled. On the other hand, all of UNUM's staff employees or contract physicians who have reviewed Mr. Kelly's medical records, but not administered any tests to Mr. Kelly, or treated him, or interacted with him . . . have disagreed and opined that there is no objective evidence supporting Mr. Kelly's claim that he cannot work.

ECF No. 25, at 2–3. But this misses the point. "Nothing in ERISA or the Secretary of Labor's ERISA regulations . . . suggests that plan administrators must accord special deference to the opinions of treating physicians." *Black & Decker*, 538 U.S. at 831. "Nor does the Act impose a heightened burden of explanation on administrators when they reject a treating physician's opinion." *Id.* Accordingly, it is settled law that the court need not "accord special weight to the opinions of a claimant's physician." *Id.* at 834.

2007) (unpublished) (affirming the denial of disability benefits even though the facts note that a "MetLife internal nurse consultant reviewed Ms. Flanagan's file and documentation" without conducting testing or a functional capacity evaluation); *Easter v. Hartford Life & Accident Ins. Co.*, No. 2:19-cv-612, 2021 WL 3709933, at *4 (D. Utah Aug. 20, 2021) ("Plaintiff also argues that Defendant erred by failing to obtain independent medical or vocational opinions as part of its initial claim review. But ERISA does not require this."). Nor does the Plan require an independent evaluation of a claimant by a physician. *See Williams v. Hartford Life & Accident Ins. Co.*, No. 2:11-cv-637, 2013 WL 1336228, at *7 (D. Utah Mar. 29, 2013) ("[A] denial decision made *without* the involvement of an independent physician is not automatically made arbitrary and capricious."). While the Plan provided that UNUM "may require you to be examined by a physician," ECF No. 21-5, at 7, the Plan never made an examination by an UNUM-hired physician a *requirement* of its investigation process.

In sum, the court is satisfied that UNUM conducted a full and fair review of the determination in Kelly's case, in compliance with ERISA's requirements.

**II.  RECORD EVIDENCE**

Kelly argues that the UNUM acted arbitrarily and capriciously because its decision was not supported by substantial evidence in the record demonstrating a lack of physical or mental limitation on Kelly's part. Because the court reviews UNUM's decision under the arbitrary and capricious standard, it must uphold the denial of benefits "so long as it is predicated on a reasoned basis." *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1134 (10th Cir. 2011) (citation omitted). "[T]here is no requirement that the basis relied upon be the only logical one or even the superlative one." *Id.* And it is not the court's role to "weigh or evaluate the medical evidence in the record." *Williams v. Metro. Life Ins. Co.*, 459 F. App'x 719, 726 n.4

(10th Cir. 2012) (unpublished). Rather, a plaintiff must demonstrate a "lack of substantial evidence" to establish that a plan administrator's decision was arbitrary and capricious. *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1282, 1282 (10th Cir. 2002).

"Substantial evidence means more than a scintilla . . . yet less than a preponderance." *Adamson*, 455 F.3d at 1212. It "is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decisionmaker." *Caldwell*, 287 F.3d at 1282 (citation and alteration omitted). The court finds that there is substantial evidence in the record to support UNUM's finding that Kelly was not disabled, either physically or cognitively.

A. ***Substantial Evidence in the Record Supports UNUM's Decision***

UNUM predicated its decision on a reasoned basis. As of April 2017, doctors reported that Kelly "has not lost any functional abilities" and "is able to do all of the calculations that he is asked to do." ECF No. 21-3, at 46. Moreover "[h]e is able to complete his work when he is there." *Id.* As of August 1, 2017, Kelly's primary care doctor placed "[n]o limitations on [his] ability to sit at a desk or table" and "[n]o limitation on keyboarding/computer work." *Id.* at 343. UNUM's records summarize that "[t]he claimant had a long-standing history of his reported symptoms" yet "the claimant was able to perform his occupational demands on a full-time sustained basis." ECF No. 21-4, at 102. And Kelly's medical records show no significant changes to his condition between the time of these reports—when Kelly worked full-time—and when UNUM denied his LTD claim. *Id.* In fact, Kelly had reported chronic fatigue for over two years before he filed for LTD benefits. ECF No. 21-3, at 151 (noting that Kelly "has never fully recovered" from February 2015 illness). Accordingly, it was reasonable for UNUM to conclude that "[t]he ongoing chronic fatigue that is being reported as rising to a level to impair the [employee's] ability to work . . . is not consistent with the normal work up to date." ECF

9

No. 21-2, at 372. In other words, Kelly was able to work normally during the time in which he reported his symptoms at the same level as when he filed for LTD benefits.

Moreover, Kelly's medical records include copious testing with his primary care providers, the University of Utah, and the Mayo Clinic that reveal no objective evidence of occupational limitations. Kelly has undergone fungal serologies, toxoplasmosis, a fibromyalgia evaluation, a chronic fatigue evaluation, a parasomnia evaluation, infectious disease tests, multiple sclerosis testing, CT scans, a brain MRI, stress echocardiograms, urinalysis, a vestibular evaluation, sleep apnea testing, autoimmune disorder testing, Lyme disease testing, and a full suite of blood analyses. *Id.* at 142, 414–25; ECF No. 21-3, at 139, 176; ECF No. 21-4, at 100–01. The vast majority of the testing returned normal results. Indeed, Kelly concedes that "objective testing has not definitely established that he suffers from a sickness or injury." ECF No. 25, at 62; *see also id.* ¶ 18 (failing to dispute that a "full blood and body work-up on Plaintiff" found "no notable abnormalities"); ECF No. 21-2, at 371 (noting on May 10, 2018 "that extensive testing has been done with only positive finding being Epstein Barr virus"). And Kelly's primary care physician stated that he felt that "the majority of the patient's complaints are supratentorial in nature as he has had extensive workups throughout his life with no etiology found." *Id.* at 196; *see also Supratentorial*, STEDMAN'S MEDICAL DICTIONARY (2014) (noting the "jargonistic use of this word in the sense of . . . *psychosomatic*"); *Cantu v. Astrue*, No. CV-10-335, 2012 WL 553141, at *5 (E.D. Wash. Feb. 21, 2012) (noting physician's opinion that Plaintiff presented with "definite supratentorial aspects" where the "file reveals no anatomical or pathophysiological reason for this claimant's allegations, i.e., they are unsupported by clinical evidence" (citation and alteration omitted)).

Where "[o]bjective medical testing revealed no cause for [his] condition or confirmation of [his] limitations," a plan administrator need not rely solely on the subjective reports of the claimant. *Rizzi v. Hartford Life & Accident Ins. Co.*, 383 F. App'x 738, 752 (10th Cir. 2010) (unpublished). In other words, "[a] plan administrator need not ignore reliable medical evidence in deference to subjective reports; nor is it unreasonable to expect some supporting evidence to buttress a claim of disability." *Id.* at 753; *see also Ellis v. Liberty Life Assurance Co. of Bos.*, 958 F.3d 1271, 1295 (10th Cir. 2020) (affirming denial of disability benefits where insurer's doctors "concluded that there was insufficient evidence from Ellis's medical records and test data to support his claim"). Here, UNUM properly considered Kelly's subjective reports. But the law does not require UNUM to disregard the voluminous objective evidence demonstrating Kelly's ability to work in favor of Kelly self-reports otherwise. *See* ECF No. 21-4, at 210 ("Minimal and variable findings on physical examinations were not [consistent with] the severe [symptoms] reported by [Kelly]."). In light of the objective medical evidence, UNUM did not abuse its discretion in determining that Kelly did not qualify as disabled, despite his entreaties to the contrary.

And even had medical testing definitively revealed the cause of Kelly's chronic fatigue, it would not sway the court. The key question in this matter is not whether Kelly had fibromyalgia or some other undiagnosed disorder—he may have had those disorders. But a diagnosis does not automatically qualify Kelly for LTD benefits under the Plan. Rather, the question for the court is whether UNUM reasonably determined that Kelly was not disabled based on the definition included in the Plan. And based on the substantial evidence in the record demonstrating that Kelly was capable of continuing to work—in spite of his chronic fatigue—the court concludes that UNUM made a reasonable determination. Indeed, Kelly himself recognizes that one possible

conclusion supported by the facts in his medical record is that "[h]e is perfectly healthy and is just malingering." ECF No. 25, at 63; *see also Meraou v. Williams Co. Long Term Disability Plan*, 221 F. App'x 696, 705 (10th Cir. 2007) (unpublished) ("In the case of a disease such as fibromyalgia, the claimant's subjective, uncorroborated complaints of pain constitute the only evidence of the ailment's severity. The medical inquiry is therefore intertwined with questions of the claimant's credibility, which are the province of the Plan administrator.").

A final note—even if the court were to find that Kelly met the Plan definition of "disabled," he would likely still not qualify for LTD payments. Kelly admitted himself that while he could not work full time, he could "function reasonably well for about ten to twenty hours a week." ECF No. 21-4, at 165. And the Plan preclude claimants from collecting LTD payment if the claimant is "able to work in your regular occupation on a part-time basis and you do not." ECF No. 21-5, at 20.

### B.  *Kelly Points to No Material Factual Dispute*

At bottom, Kelly disputes the substance of only three facts.[5] First, Kelly objects to UNUM's statements that "[p]ayments under the Plan stop if the participant can perform his regular occupation (or after 24 months, any gainful occupation) on even a part-time basis." ECF No. 25 ¶ 8. Instead of directly responding to this fact, Kelly simply states that the fact is disputed and repeats the Plan's definition of disabled. But this is not a disputed fact. Kelly correctly states the Plan's definition of disabled. But the Plan also states that payments will stop "on the earliest of the following: during the first 24 months of payments, when you are able to work in your regular occupation on a part-time basis and you do not; [or] after 24 months of payments, when you are able to work in any gainful occupation on a part-time basis and you do not." ECF

---

[5] Kelly also disputes, in paragraph 24, whether UNUM applied the correct test in evaluating his claim. The court addresses that dispute below.

No. 21-5, at 20. Accordingly, because of the indisputable evidence in the administrative record that establishes when payments under the Plan cease, the court does not consider this fact in dispute.

Second, Kelly disputes in part two facts related to statements he made during an interview with an UNUM representative. Kelly states that contrary to UNUM's representations, he primarily does nature photography and has never been paid for his photography. ECF No. 25 ¶ 19. And Kelly disputes that his employer ever volunteered to hire him for five hours a week of consulting. *Id.* ¶ 20. But neither of these disputed facts affect the court's analysis. The subject of Kelly's photography hobby is not relevant to his LTD claim. Nor is whether he received payment for his photographs. And whether Kelly's employer ever volunteered to hire him on a part-time basis does not impact whether his condition met the definition of disabled under the Plan. That disputed fact would go to whether Kelly was willing and able to work part-time. But the court need not reach that question (or remand for further factfinding on that question) because it finds that UNUM made a reasonable determination that Kelly's condition did not meet the Plan's definition of disabled. Because Kelly points to no genuine issues of material fact to resolve, summary judgment is appropriate.

Accordingly, UNUM has clearly established that there is substantial evidence in the record to support UNUM's determination that Kelly does not meet the Plan's definition of "disabled." Moreover, Kelly has not demonstrated any genuine issue of material fact in the record that would preclude the court from granting summary judgment.

## III.    ACUTE WORSENING

Kelly argues that UNUM acted arbitrarily and capriciously by requiring that Kelly demonstrate some acute worsening of his symptoms. Kelly is correct that the Plan does not

13

require that a claimant demonstrate an acute worsening of symptoms. But, as part of its investigation, UNUM's reviewers considered Kelly's symptoms and ability to work from 2015 to mid-2017. During that time period, Kelly was able to work. Because he could work during that time period, UNUM reasonably searched for some worsening of symptoms around the last day of work which would explain why Kelly's condition no longer permitted him to work. *See* ECF No. 21-3, at 280 ("[W]e need to understand what changed to cause him eventually to go oow [out of work] . . . those evaluations [from the University of Utah and the Mayo Clinic] are relevant in that he continued to work with what appear to be the same symptoms.").

Accordingly, UNUM did not require Kelly to demonstrate an acute worsening of symptoms around the time of his LTD claim as a condition of granting the claim. Rather, UNUM simply investigated whether the record indicated a worsening of symptoms that would explain why Kelly was previously able to work but could no longer do so. Such evidence is relevant to UNUM's disability determination.

### IV.    PROPER TEST FOR DISABILITY DETERMINATION

Although not explicitly included as an argument in his brief, Kelly repeatedly objects to UNUM's statements of fact by complaining that UNUM's reviewers applied the wrong test. ECF No. 25 ¶¶ 24, 27–29, 41, 43, 47–48, 50, 53, 56–58, 62. The court rejects this argument.

First, Kelly misconstrues the correct test under the Plan. Specifically, he misunderstands the definition of "limited" under the Plan. Kelly reads the Plan as requiring "a participant in the Plan . . . to have a 'sickness or injury' which causes the participant to be '<u>limited</u> [not unable] from performing the material and substantial duties' of his 'regular occupation.'" ECF No. 25 ¶ 6 (alteration in original). But the Plan states that "limited means what you cannot or are unable to do." ECF No. 21-5, at 29. In other words, the Plan defines an activity that a participant is

"limited" from performing as one that the participant is unable to do. This misunderstanding leads Kelly to confuse his analysis by pointing to evidence that he was limited, but not unable, to perform the material and substantial duties of his job.

Second, Kelly asserts that various facts included in UNUM's motion demonstrate that its reviewers used incorrect standards to determine eligibility under the Plan. For instance, Kelly objects that "[t]he test is not whether there is 'clinical evidence to support a change [a limitation or reduction] in [his] functional capacity' around the time Mr. Kelly stopped working." ECF No. 25 ¶ 27. Similarly, Kelly argues that "[t]he test is not whether the normal [medical] work up to date is consistent with the employee's report that his chronic fatigue has risen to the level to impair the employee's ability to work or complete ADL's [activities of daily living] or household chores." *Id.* ¶ 29. And Kelly objects that "[t]he test is not whether a therapist's session notes 'supported a decrease in cognitive functional capacity . . . that would be expected to preclude [performance of] the above [occupational] demands.'" *Id.* ¶ 28. Finally, Kelly argues that "[t]he test is not whether the examinations, diagnostic findings, and other information in the claim file would be consistent with [that is, would cause or account for or explain] the existence, intensity, frequency and duration of Plaintiff's alleged symptoms." *Id.* ¶ 41.

But the allegedly incorrect "tests" are merely UNUM's mechanisms for investigating whether Kelly met the definition laid out in its Plan documents, i.e., whether Kelly was "limited from performing the material and substantial duties of [his] regular occupation due to [his] sickness or injury" and whether Kelly had "a 20% or more loss in [his] indexed monthly earnings due to the same sickness or injury." ECF No. 21-5, at 14. Examining whether the clinical evidence demonstrates a reduction in occupational capacity, whether his therapist's notes demonstrate a reduction in cognitive functional capacity, or whether his medical work up was

15

consistent with his reports of chronic fatigue all pertain to determining whether Kelly met the Plan's definition of disabled.

Indeed, the appeals denial letter that UNUM sent to Kelly explains in substantial detail how it marshaled evidence from its investigation to determine that Kelly did not qualify under the Plan's definition of disabled for purposes of LTD. The letter specifically cites the Plan's definition of disabled. ECF No. 21-4, at 491. And the letter provides several pages of explanation as to why Kelly's condition did not meet the definition at the time of denial. For example, it notes that "[t]he level and intensity of your treatment remained stable and modest without evidence of a significant increase that would be expected with refractory or progressing symptoms" and that "[p]hysical examination findings were not consistent with the severe level of impairment you reported." *Id.* at 487–88. The letter further cites the various negative tests reported as part of Kelly's extensive work up. *Id.* And it states that "[s]pecific cognitive deficits were not identified on examinations" and that "[y]our therapist did not indicate you had any restrictions/limitations related to your behavioral health conditions." *Id.* at 487–89. All of these conclusions are based on UNUM's thorough investigations into Kelly's clinical records, medical work ups, therapist session notes, and diagnostic findings that Kelly mischaracterizes as the "wrong tests."

In sum, UNUM did not apply the wrong tests. While UNUM remained focused on determining whether Kelly met the Plan definition for disabled, UNUM used a number of different mechanisms, including reviewing Kelly's medical records, talking with his providers, and interviewing Kelly to inform its decision. These actions, and the research questions that the reviewers investigated, do not indicate that UNUM used the "wrong test." Rather they

demonstrate a thorough review of Kelly's case to determine if he met the Plan's parameters for LTD coverage.

* * *

In sum, Kelly has failed to demonstrate that UNUM acted arbitrarily and capriciously by denying him LTD benefits. The administrative record indicates that UNUM followed a reasonable methodology in evaluating Kelly's claim. It examined his medical records, spoke to providers, interviewed Kelly himself, and considered documents submitted by Kelly. And substantial evidence in the record supports UNUM's conclusion that Kelly does not have physical or cognitive impairments that limit his ability to work. UNUM did not improperly require Kelly to demonstrate an acute worsening of his symptoms, nor did it apply the wrong test in making its disability determination. Rather, it conducted a careful review of all of the information available in Kelly's case and investigated specific questions to determine whether Kelly met the Plan's definition of disabled. At bottom, the court has no doubt that UNUM provided the full and fair review required by ERISA.

## CONCLUSION

The court GRANTS UNUM's motion for summary judgment.

DATED March 21, 2022.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge